## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; AND THEIR MEMBERS, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. _____ |
| BRAD RAFFENSPERGER, Secretary of State of Georgia, in his official capacity | ) ) ) | |
| *Defendant.* | ) | |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; and their members, by and through their undersigned counsel, for their Complaint against Defendant Brad Raffensperger, the Secretary of State of Georgia, in his official capacity, allege and state as follows:

## **INTRODUCTION**

1.     This is a voting rights lawsuit filed to protect fundamental rights guaranteed by the United States Constitution and federal law.[1] Plaintiffs seek

_____

[1] Plaintiffs' counsel served a 20-day notice letter pursuant to Section 8 of the National Voter Registration Act of 1993 (52 U.S.C. § 20507, 20510)(a)(2)

prospective declaratory and injunctive relief against the Defendant, Brad Raffensperger, in his official capacity as the Secretary of State of Georgia, enjoining the enforcement and implementation of certain provisions of Georgia Senate Bill 189 ("S.B. 189"), a bill passed by the Georgia Legislature on March 29, 2024, and enacted on May 6, 2024, when it was signed into law by Governor Brian Kemp.[2]

2.     This lawsuit challenges certain provisions of Sections 4 and 5 of S.B. 189. Specifically, this lawsuit challenges the provisions of Section 5 providing that "[p]robable causes [for sustaining a challenge to an elector's qualification] shall include… an elector voting or registering to vote in a different jurisdiction; an elector obtaining a homestead exemption in a different jurisdiction; or an elector being registered at a nonresidential address as confirmed or listed by or in a government office, data base, website, or publicly available sources derived solely from such governmental sources," S.B. 189 § 5(b), and the provision of Section 4 providing that "[t]he mailing address for election purposes of any person of this state who is homeless and without a permanent address shall be the registrar's office of the county in which such person resides," S.B. 189 § 4(a)(1.1) (hereinafter "the challenged provisions").

---

("NVRA") on Defendant Raffensperger, members of the State Election Board, and multiple counties, on July 10, 2024. A copy of this letter is attached as Exhibit 1.
[2] A copy of S.B. 189 as passed by the Georgia General Assembly on March 29, 2024, and enacted into law on May 6, 2024 ("S.B. 189"), is attached as Exhibit 2.

3.     Without action by this Court, eligible Georgia voters—in particular student voters residing in campus dormitories, unhoused and housing-insecure voters, and voters residing in shelters, nursing homes, military facilities, and other facilities that may be classified as "nonresidential" under local zoning ordinance or other official designation—will face severe burdens on their fundamental right to vote, up to and including unlawful removal from the voter rolls and disenfranchisement, without any legitimate justification or basis in state or federal law.

## I.     Section 5

4.     Section 5 of S.B. 189, which went into effect on July 1, 2024, *inter alia*, authorizes unlimited voter eligibility challenges brought by third parties pursuant to O.C.G.A. § 21-2-230 ("230 Challenges")  against registered Georgia voters on the basis that they are registered at a "nonresidential address" or that information suggests they may have moved.

5.     Before the enactment of S.B. 189, Georgia law permitted third parties to challenges a voter's eligibility and required that the board of registrars[3] determine whether there was probable cause to sustain such challenge.  S.B. 189 amended the

---

[3] Every Georgia county has a Board of Registrars, also known in some counties as a Board of Elections and Registration. Throughout this Complaint, "board of registrars," "board of elections and registration," and "county board" are used interchangeably.

standard for the probable cause determination to mandate that probable cause "*shall include . . . an elector being registered at a nonresidential address*," despite the fact that having a "residential" address is not a qualification to vote under state or federal law and thus has no bearing on a voter's eligibility. S.B. 189 § 5(b); *see also* O.C.G.A. §§ 21-2-216, 21-2-217 (emphasis added).

6.     Pursuant to Section 5 of S.B. 189, once the Board sustains a finding of probable cause, the voter is put into "challenged" status in the statewide voter registration system and must rebut the challenge when the voter requests a ballot. O.C.G.A. § 21-2-230. If the voter fails to rebut the challenge or does not vote in the next election, the 230 Challenge is treated as a challenge under O.C.G.A. § 21-2-229 ("229 Challenge"), *see* O.C.G.A. § 21-2-230(f), which provides that upon a finding of ineligibility by the county board "the person's application for registration shall be rejected or the person's name removed from the list of electors." O.C.G.A. § 21-2-229(d).

7.     Importantly, absent from Section 5 of S.B. 189, or anywhere else in the law, is a conclusive statement that a voter may rebut a finding of probable cause by demonstrating that the voter meets the residency requirements set forth in the Georgia Constitution and under Georgia law—regardless of whether the voter resides at a "nonresidential" address and how the term "nonresidential" is defined.

8.     Additionally, Section 5 of S.B. 189 provides that county boards may find probable cause to sustain a challenge where information suggests the challenged voter may have moved. This is contrary to Section 8(d) of the National Voter Registration Act (NVRA), which dictates that the only lawful bases for removing a registered voter from the rolls based on a change in residence are (1) the voter requests or confirms his or her change of address in writing; or (2) the voter is sent a postage prepaid and pre-addressed mailing, fails to respond to that mailing, and then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d).

9.     There is no requirement that voters be notified that their eligibility has been challenged and that they must take action to rebut a challenge, nor what they must do to successfully rebut a challenge. Even if a county board finds probable cause to sustain a challenge to a voter's eligibility, the registrars need only "notify the challenged elector and afford such elector an opportunity to answer" the challenge "if practical." O.C.G.A. § 21-2-230(b).  S.B. 189 fails to define in what circumstances a voter's notification of a challenge is or is not "practical."

10.     Plaintiffs are imminently threatened with a concrete and particularized injury that is fairly traceable to the challenged action of the Defendant. The threat of removal of eligible, registered voters solely on the basis that they used an alleged "nonresidential" address to register to vote violates state and federal law.  Regardless of whether a voter is ultimately removed from the voter rolls, the legal requirement

5

that a voter must rebut a finding of "probable cause" based on the character of their address as "nonresidential" imposes a severe burden on the right to vote that fails to advance any legitimate governmental purpose. The "residential" nature of a voter's address is immaterial to a voter's ability to lawfully cast a ballot under Georgia law. That third parties may challenge a voter's eligibility based on facts untethered to a voter's legal eligibility will result in arbitrary, standardless, nonuniform, and discriminatory treatment of eligible voters within and across Georgia counties, and will deprive eligible voters of a constitutionally protected liberty interest (i.e., their right to vote) without due process. The threat that a voter may be deprived of their right to vote without due process is particularly acute here where the county board is not legally obligated in all circumstances to provide notice to the voter of the challenge to their eligibility.

11.     Further, challenging or removing voters based on information suggesting they may have moved violates the NVRA's federally mandated procedural protections governing the removal of voters who may have changed their residence. These injuries are redressable by a judicial decision including declaratory and injunctive relief prohibiting the Defendant from implementing the challenged provisions.

**II.     Section 4**

12.     Section 4 of S.B. 189 singles out voters who are "homeless and without a permanent address" by mandating that these voters use their county registrar's office as their mailing address for the receipt of all official election mail. All other Georgia voters are permitted to use any mailing address of their choice to receive election-related mail, including, *inter alia*, a post office box; address of a friend, relative, or other person; or a business address. Despite the fact that Georgia voters who are unhoused or housing-insecure often use shelters, churches, post office boxes, or the addresses of friends, relatives, or other persons as their mailing address for the receipt of essential election mail, Section 4 of S.B. 189 prohibits these voters from continuing to use their choice of mailing address for their election-related mail—a choice that is available to every other Georgia voter. Neither the text of Section 4 of S.B. 189 nor its legislative history provide any legitimate rationale for singling out "homeless" Georgia voters for this treatment.

13.     Additionally, Section 4 of S.B. 189 does not define "homeless and without a permanent address," nor does it provide any process for determining whether a voter falls under this designation or how this address requirement will be implemented for new or previously registered voters. Notably, the state-specific instructions for Georgians using the federal voter registration form are entirely devoid of instructions for "homeless voters without a permanent address," and give

no explanation of the county registrar address requirement or where voters can locate county registrar address information. Nor does the current Georgia state voter registration form contain any directive or guidance about this new mailing address requirement for voters who are "homeless and without a permanent address."

14.     Section 4's requirement that all "homeless" voters use their county registrar's address for election-related mail imposes significant burdens on unhoused and housing-insecure voters who are particularly ill-equipped to absorb the additional barriers to voting imposed by this mandate, including voters who do not reside within walking distance of the county registrar's office, or who otherwise face challenges with disabilities, illiteracy, language access, or lack resources needed to obtain transportation to the county registrar's office during regular business hours to pick up their election mail.

15.     Furthermore, Section 4 fails to provide any requirement that affected voters be notified of this change imposing the mailing address requirement for receipt of election-related mail—and indeed local officials may interpret this provision as prohibiting them from providing affected voters with a notice sent to their former mailing address—further compounding the burdens associated with their inability to ensure voters timely receive essential election-related mail.

16.     As a result of this mandate and the burdens it imposes, this class of voters is at risk of missing important election deadlines and not receiving timely

notice of polling place changes, voter eligibility challenges, notices related to the status of their absentee ballots, or absentee ballots themselves. Consequently, Section 4 places these voters at a significantly heightened risk of disenfranchisement based solely upon their "homeless," unhoused, or housing-insecure status, in violation of federal law.

17. Moreover, S.B. 189 is devoid of any information about how county registrars will implement this change or how this new burden on county registrars will be funded. Some, if not all, county registrars lack the resources, physical space, or personnel capacity needed to create and effectively operate a mail room for unhoused or housing-insecure voters who are now required to use that office as their mailing address. Nor does S.B. 189 mandate that county registrars actually accept or provide election mail to "homeless" voters, despite the requirement that those voters list that address as their mailing address. The inability of county registrars to provide adequate service and accessibility to these voters with respect to election-related mail further burdens these voters' right to vote while failing to advance any legitimate governmental purpose. These injuries are redressable by a judicial decision including the issuance of declaratory and injunctive relief prohibiting the Defendant from implementing the challenged provisions.

18. The challenged provisions of S.B. 189 therefore violate federal and state law and must be preliminarily and permanently enjoined.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a) and 52 U.S.C. § 10308(f) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Fourteenth Amendment to the United States Constitution, the National Voter Registration Act of 1993, and the Civil Rights Act of 1964, and 42 U.S.C. § 1983, which provides Plaintiffs with a private right of action to bring suit to protect their constitutional rights. This Court likewise has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

20.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     This Court has personal jurisdiction over the Defendant, who is sued in his official capacity.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and Local Rule 3.1 because, *inter alia*, the Defendant resides in this district and this division and a substantial part of the legal and factual allegations giving rise to Plaintiffs' claims occurred in this district and division.

## PARTIES

### I.     Plaintiffs

####     A.     The Georgia State Conference of the NAACP

23.     Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP (the "Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular Black Americans. It is headquartered in Atlanta and currently has approximately 10,000 members, across approximately 180 local units in at least 120 counties in Georgia, including  several college and university units throughout the state.

24.     The Georgia NAACP has long sought to prevent efforts to suppress or disenfranchise Black voters and other voters of color and continues to work to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote ("GOTV") efforts, election protection, and census participation. The organization focuses efforts on Black and other underrepresented communities in Georgia, including unhoused or housing-insecure individuals, students, nursing home residents, and other individuals residing in premises that may be unconventional or otherwise deemed "nonresidential" under S.B. 189. Specifically,

the Georgia NAACP partners with local churches, shelters and transitional housing facilities, and other organizations to help register to vote unhoused or housing-insecure individuals, students, nursing home residents, and other individuals residing in premises that may be classified as "nonresidential". The Georgia NAACP also works to help these individuals secure, exercise, and, when necessary, defend their right to vote.

25.     The Georgia NAACP branches in counties across Georgia are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and GOTV efforts, including Sunday early voting events, such as "Souls to the Polls." Beyond voting, the Georgia NAACP's general mission focuses on multiple pillars of social justice and civil rights, including ensuring political, educational, social, and economic equality of rights for all persons, and eliminating racial hatred and racial discrimination.

26.     The Georgia NAACP has conducted text and phone-banking programs as well as in-person outreach and engagement with voters throughout Georgia to encourage voter participation and to educate the public about all aspects of the voting process, including about the challenged provisions of S.B. 189.

27.     The college and university units of the Georgia NAACP are located throughout the state of Georgia.  The college and university units have engaged in voter registration drives and public education to ensure student unit members and

other students can participate in elections. Dormitories or other student housing facilities located at universities and colleges in Georgia may be classified as "nonresidential" in zoning designations in some jurisdictions, making student unit members and other students who reside on campus in such dormitories or other student housing facilities vulnerable to challenge under Section 5 of S.B. 189.

28.     Spelman College is a Historically Black College located in Fulton County, with over 97% of students identifying as Black.[4] The Spelman College NAACP ("Spelman NAACP") unit has participated in voter registration drives to encourage students to register to vote and assists them with registering and voting. Spelman NAACP has worked with RepGA and Black Voters Matter on their Black Youth Renaissance Tour and specifically on their "Vote Where You Live, Vote Where You Learn" program, encouraging students to register at their address on campus. This includes addresses of dormitories on campus, which are located in an area that is zoned as nonresidential. *See Living on Campus*, SPELMAN COLLEGE, https://www.spelman.edu/student-life/housing-and-residence-life/living-on-campus/ (all dormitories use address 350 Spelman Lane S.W., Atlanta, GA 30314); Official Zoning Map Department of City Planning, ATLANTA, https://gis.atlantaga.gov/zoningmap/, (350 Spelman Lane S.W., Atlanta, GA 30314

---

[4] *2022–23 Fact Book*, SPELMAN COLLEGE 16, https://www.spelman.edu/_1_Docs-and-Files/about/institutional-research/2022-23-fact-book-final.pdf.

zoned "Office-Institutional"). Spelman NAACP has to divert resources to change this programming in light of S.B. 189, and many of its members are vulnerable to voter challenges because they are registered at campus, nonresidential addresses.

29.     As another example, Savannah State University, located in Chatham County, is the oldest public Historically Black College or University in Georgia with over 83% of students identifying as Black.[5] The Savannah State University NAACP ("Savannah State NAACP") unit has participated in voter registration drives to encourage students to register to vote and assist them with registering and voting. This includes encouraging students residing at one of Savannah State's seven residential facilities to register to vote at their campus address. These facilities are located in an area that is zoned as nonresidential. *See   Residential Facilities*, SAVANNAH                    STATE                    UNIVERSITY, https://www.savannahstate.edu/housing/facilities.shtml (all residential facilities located on campus); SAGIS map viewer, *available at* https://www.sagis.org/map/ (all campus addresses zoned "Institutional Professional"). The Georgia NAACP has an interest in preventing the disenfranchisement of eligible voters, including its

---

[5] SSU Fast Facts and Figures 2021–22, SAVANNAH STATE UNIVERSITY, https://www.savannahstate.edu/irp/documents/ssu-fast-facts-and-figures-2021-2022.pdf.

members and voters it assists with navigating the voting process, including voter registration.

30.    Due to the substantial changes in what may constitute probable cause for third-party voter challenges and a new mandate that "homeless" voters without a "permanent address" will be required to receive their election-related mail at their county registrar's office, the Georgia NAACP will not only have to modify its messaging to Black voters and other voters of color to reflect these changes, but the Georgia NAACP will also have to divert resources from its ongoing election protection, advocacy, and GOTV efforts to educate and assist voters impacted by these provisions.

31.    The Georgia NAACP brings this action on behalf of itself and its individual members, including those members who are registered voters residing throughout the Georgia whose right to vote will be threatened by the challenged provisions of S.B. 189.

**B.    The Georgia Coalition for the People's Agenda, Inc.**

32.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. (the "GCPA" or "People's Agenda") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia.  The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members across the Georgia in various cities and counties.

33.     In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, through which it provides outreach and support to voters and prospective voters of color and underrepresented communities outside of the Metro Atlanta area. GCPA is planning to open an office in Rome later this year.  Each office serves roughly 10 to 12 surrounding counties on a regular basis.

34.     The GCPA works to encourage and support voter registration and participation, particularly among Black and other underrepresented communities in Georgia, including unhoused, "homeless," and housing-insecure individuals, students, nursing home residents, and other individuals who are residing at addresses which may be characterized as "nonresidential". This includes, but is not limited to, registering voters at Georgia high schools, universities, churches and centers that provide meals to unhoused and housing-insecure individuals, and senior and assisted living facilities.

35.     The GCPA's support of voting rights is central to its mission.  The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, communication, and outreach, including work to promote voter registration, voter education, get out the vote efforts, election protection, census participation, and litigation.

36.    The GCPA conducts voter registration drives; provides voter ID assistance; distributes civic-education materials; sponsors Public Service Announcements ("PSAs"); places billboard ads; conducts phone banking and text message campaigns; participates in earned media appearances; and organizes "Souls to the Polls" get out the vote events during Sunday early voting, rides to the polls, and other get out the vote and voter assistance efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underrepresented communities.

37.    The GCPA also participates in voter education and voter empowerment programs, including, but not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about their options to vote in person during early voting and on Election Day and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely; and helping voters understand new requirements and processes affecting voter registration, voting, and voter qualification challenges, including the challenged provisions of S.B. 189.

38.    Outside of the voting arena, the GCPA works on criminal justice reform, equity in education, economic empowerment for Black-owned businesses, environmental justice, and elder issues. The GCPA seeks to balance its limited time and resources between these areas.

17

39.    The GCPA has limited resources to devote to and implement its programmatic work. It currently has seven paid full-time staff members working in the main Atlanta office, and six coordinators, each assigned to a particular area of Georgia. The coordinators are responsible for organizing the GCPA's activities in the communities they serve, including civic engagement activities, voter registration drives, voter mobilization efforts, and the organization's education and coalition work. The GCPA also relies upon unpaid volunteers to assist the organization with its work across the State of Georgia, including in Atlanta.

40.    Due to the changes to the challenges process and the uncertainty created by the challenged provisions of S.B. 189, the GCPA has had to, and will continue to have to, divert attention of its staff and membership away from its other programmatic areas and focus instead on voter education, defense, and support.

41.    For example, the GCPA Executive Director, who is responsible for overseeing all aspects of the organization's mission, and the GCPA Policy and Engagement Director, who is responsible for overseeing the overarching policy goals of the organization beyond the voting context, have been forced to divert from work related to GCPA's non-voting initiatives in order to focus on the increase in the number of challenges as a result of S.B. 189, including spending days attending challenge meetings in multiple counties including Forsyth and Gwinnett Counties. Additionally, the GCPA Chatham County Coordinator has had to divert time and

attention from her work setting up citizen review boards to address challenges to students registered at Savannah State University, one of the universities that GCPA visits to register voters.

42.    Also, in response to S.B. 189, GCPA has had to divert resources from other initiatives to create tailored phone- and text-bank efforts to reach potentially impacted members and individuals that GCPA has helped register who might be susceptible to challenges under Section 5 of S.B. 189. This in turn detracts time and energy from GCPA's other voting and non-voting work.

43.    The GCPA is active in supporting student voter registration and education programs at numerous colleges and universities including, but not limited to, Savannah State University, Spelman College, Morehouse College, Clark Atlanta University, Georgia State University, and Mercer University. Students residing in facilities located on campus at these institutions are vulnerable to challenges brought under Section 5 of S.B. 189 on the basis that their address is zoned as nonresidential.

44.    The GCPA is also active in supporting high school voter registration and education programs, including focusing on supporting students who are unhoused or housing insecure to register and pre-register to vote. These individuals are vulnerable both to challenge under Section 5 of S.B. 189 on the basis that their address is nonresidential and to being forced to use their county registrar's office as

their voter registration mailing address under Section 4 of S.B. 189 on the basis that they are homeless or lack a permanent address.

45.     The GCPA has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it may have assisted with navigating the voting process.

46.     The GCPA brings this action on behalf of itself and its individual members, including those members who are registered voters residing throughout the State of Georgia and whose right to vote will be threatened by the challenged provisions of S.B. 189.

**II.     Defendant**

47.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia and the state's chief election officer and is responsible for administering and implementing Georgia's election laws and regulations. *See* O.C.G.A. § 21-2-50. "The Secretary of State is designated as the chief state election official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C. Section 1973gg-8 [now codified as 52 U.S.C. § 20509]." O.C.G.A. § 21-2-210. Secretary Raffensperger is further responsible for maintaining the statewide voter registration system, O.C.G.A. §§ 21-2-219 through 21-2-225, and training the state's local elections officials, O.C.G.A. § 21-2-100.

48.    Secretary Raffensperger is sued in his official capacity as to Counts I,

II, III, IV, V, and VI.

## STATEMENT OF FACTS

### I.    General Background

49.    Section 5 of S.B. 189 significantly increases the likelihood that mass

voter-qualification challenges will result in the removal and disenfranchisement of

eligible voters, simply because their address is determined to be "nonresidential"—

a status designation that has nothing to do with their eligibility to vote under Georgia

law.

50.    Section 4 of S.B. 189 compounds the threat of disenfranchisement to

unhoused and housing-insecure voters—already among the most vulnerable and

marginalized groups of voters—by forcing these voters to receive their official

election mail, including essential information such as precinct locations, challenge

notices, and absentee ballots, at their county registrar's office rather than at their

preferred address despite all other Georgia voters being permitted to do so.

51.    In 2022, the U.S. Department of Housing and Urban Development

reported to the United States Congress that there were 10,689 people experiencing

homelessness in the State of Georgia. OFF. OF CMTY. PLAN. AND DEV., U.S. DEP. OF

HOUS. AND URBAN DEVEL., 2022 ANN. HOMELESSNESS ASSESSMENT REP. TO CONG.

16, https://www.huduser.gov/portal/sites/default/files/pdf/2022-ahar-part-1.pdf. Of

this population, 5,535 were unsheltered and 5,154 were residing in shelters providing temporary living arrangements. *Id.* 95. The Georgia Department of Community Affairs conducts a point-in-time assessment of the number of unhoused people residing in Georgia. In its most recent report, in February 2022, the assessment found that Black people comprised 35% of the unsheltered homeless population and 57% of the sheltered homeless population. GA. DEP. OF CMTY. AFF., DEP. OF CMTY. AFF. STATEWIDE POINT IN TIME COUNT HOMELESS REP. FOR 2022, 24, 32, https://www.dca.ga.gov/sites/default/files/pit_report_2022.pdf. This despite that only 31% of Georgia's population is Black, according to the 2020 Census. DEC Demographic Profile: Georgia, U.S. CENSUS BUREAU (2020), https://data.census.gov/table/DECENNIALDP2020.DP1?g=040XX00US13&d=D EC Demographic Profile.

## II.   Georgia Law Governing Voter Qualification and Challenges

### A.   Voter Qualification and Residency Requirements

52.   The Constitution of the State of Georgia provides that "[e]very person who is a citizen of the United States and a resident of Georgia as defined by law, who is at least 18 years of age and not disenfranchised by this article, and who meets minimum residency requirements as provided by law shall be entitled to vote at any election by the people." Ga. Const, Art. II, Sec. I, Par. II.

53.     The Georgia Legislature has codified this constitutional right to vote by providing an exclusive list of qualifications to vote in Georgia elections, which are that a person must be: (1) "[r]egistered as an elector in the manner prescribed by law"; (2) a citizen of [Georgia] and of the United States"; (3) "[a]t least 18 years of age on or before the date of the primary or election in which such person seeks to vote;" (4) "[a] resident of [Georgia] and of the county or municipality in which he or she seeks to vote;" and (5) "[p]ossessed of all other qualifications prescribed by law." O.C.G.A § 21-2 216(a). The only exceptions to the right to register and vote are that (1) Georgians who have been "convicted of a felony involving moral turpitude" may only register, remain registered, or vote upon completion of the sentence; and (2) Georgians who have been "judicially determined to be mentally incompetent" may only register, remain registered, or vote once the disability has been removed. Ga. Const, Art. II, Sec. I, Par. III; O.C.G.A § 21-2-216(b).

54.     The Georgia Legislature has codified its definition of a person's residence as "that place in which such person's habitation is fixed, without any present intention of removing therefrom[,]" O.C.G.A. § 21-2-217(a)(1), and has provided that an individual does not lose residency by leaving their residence "for temporary purposes only, with the intention of returning, unless such person shall register to vote or perform other acts indicating a desire to change such person's citizenship and residence[.]" O.C.G.A. § 21-2-217(a)(2). *See also Smith v. Long*

23

*Cnty. Bd. of Elections & Registration*, 312 Ga. 306, 316 (2021); *Cook v. Bd. of Registrars of Randolph Cnty*., 320 Ga. App. 447, 449–53 (2013).

55.     The Georgia Legislature has not prescribed any other qualifications to vote related to a person's residence, including the status, designation, type, "residential" nature, or other factor related to a particular residence or address—nor could it, given that it lacks authority to do so under the Georgia Constitution. *SeeDemocratic Party of Georgia, Inc. v. Perdue*, 288 Ga. 720, 725 (2011) (citing *Franklin v. Harper*, 205 Ga. 779, 790(3) (1949)).

56.     To the contrary, Georgia provides a process for people without standard addresses or who live in an area without house numbers or street names, such as unhoused people, to register to vote by drawing a picture of the location where they reside. *See* State of Georgia Application for Voter Registration, *available at* https://sos.ga.gov/sites/default/files/forms/GA_VR_APP_2019.pdf.

57.     The federal voter registration form likewise affords registrants this option, and includes Georgia-specific instructions that do not specify any requirement that Georgians reside at a "residential" address, much less prohibit Georgians from registering to vote with a "nonresidential" address. *See* Register to Vote In Your State By Using This Postcard Form and Guide, available at https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.

58.     Further, neither the state nor federal voter registration forms contain any instructions that "homeless voters without a permanent address" are required to designate the county registrar's office as their mailing address for election-related mail. Numerous Georgia voters are automatically registered to vote using the Federal Form when they obtain a state-issued ID from the Department of Driver Services. In order for Georgia to change the Federal Form instructions, it would have to first place a request and then get a majority of the U.S. Election Assistance Commissioners to approve the change in the Federal Form instructions. *See League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185–86 (D.D.C. 2021). Not only have the U.S. Election Assistance Commissioners not approved such a change, but Georgia has not even requested such a change.

### B.     Voter Qualification Challenge Process

59.     As of July 1, 2021, with the enactment of Georgia S.B. 202, which amended, *inter alia*, aspects of Georgia law governing voter qualification challenges—specifically O.C.G.A. § 21-2-229[6] and § 21-2-230[7]—registered voters in a county can make unlimited mass challenges to the eligibility of other registered voters in that county to remain on the voter registration rolls and to cast a ballot that will be counted.

---

[6] Attached as Exhibit 3.
[7] Attached as Exhibit 4.

60.    229 Challenges, if sustained, result in the voter's removal from the state's voter registration rolls. O.C.G.A. § 21-2-229(d). 230 Challenges, if the voter fails to rebut the challenge or does not vote in the next election, are converted to a 229 Challenge. O.C.G.A. § 21-2-230(f).

61.    Georgia law does not impose any penalty on proponents of such mass challenges—even when they submit challenges which are unfounded or discriminatory.

62.    Prior to S.B. 189, county boards of elections and registration could clearly dismiss unfounded challenges lacking probable cause that a voter was not a qualified elector. Under S.B. 189, however, a finding of probable cause may now be sustained based on a factor that is irrelevant to a voter's qualifications under Georgia and federal law and goes unmentioned by both the state and federal registration forms—i.e., whether the voter's address is "nonresidential."  As a result, S.B. 189 will cause fully qualified and eligible voters to be unfairly subjected to voting eligibility challenges, which they will be required to rebut in order to remain on the voter rolls and to vote in subsequent elections. In this way, S.B. 189 burdens these voters' right to vote and exposes them to potential disenfranchisement.

63.    Indeed, one of the initiators of a 2020 mass challenge of over 300,000 voters relying on NCOA data acknowledged that basing challenges on such data was likely to sweep in eligible student voters. *Fair Fight Inc.*, No. 2:20-CV-00302-SCJ,

2024 WL 24524, at *9 (N.D. Ga. 2024); *see also Majority Forward v. Ben Hill County Board of Elections*, 512 F.Supp.3d 1354, 1372 (M.D. Ga. 2021).

64.     Moreover, Georgia county boards of elections and registration have been found to have been unable to or have failed to conduct the level of individualized inquiry necessary to make an accurate determination as to whether there is probable cause to sustain a challenge to an individual voter's qualification in the context of mass challenges. *See, e.g.*, *Majority Forward*, 512 F. Supp. 3d at 1371.

65.     As discussed above, *supra* pp. 3-6, S.B. 189 further promotes unlimited challenges by third parties against registered Georgia voters by expanding the circumstances under which probable cause to sustain a challenge may be found to include a factor that is not relevant under either state or federal law—that the voter resides at a "nonresidential" address—and making it even more likely that eligible voters will be disenfranchised.

## III.    Legislative History of S.B. 189

66.     The enacted version of S.B. 189 departs significantly from the version of the bill that was initially introduced. In fact, when S.B. 189 was first introduced in February 2023, it did not include the provisions challenged in this Complaint. Georgia Senate Bill 189, as introduced, *available at* https://legiscan.com/GA/text/SB189/id/2702104.

67.     The procedure leading up to the passage of S.B. 189 was rushed and irregular. Bills covering the same subjects had been introduced but ultimately stalled. In response to this, on March 28, 2023, one day before Sine Die (the final day of session) in the Georgia Legislature, S.B. 189 was reintroduced as an omnibus elections bill, stitching together several disparate proposed bills under the purported rationale of protecting election integrity.

68.     Throughout the debate on S.B. 189, its supporters used the pretextual— and disproven—myth of mass voter fraud and unsubstantiated claims of election irregularities in Georgia to attempt to justify their actions.

## IV.     Section 5 of S.B. 189

69.     Section 5 of S.B. 189, which went into effect on July 1, 2024, provides that, for purposes of an O.C.G.A. § 21-2-230 challenge to a registered voter's eligibility to vote in a specific election, "[p]robable causes shall include, but not be limited to . . . an elector being registered at a nonresidential address as confirmed or listed by or in a government office, data base, website, or publicly available sources derived solely from such governmental sources." S.B. 189 § 5(b).

70.     As noted above, there is no requirement under federal law for a voter to have a "residential" address to exercise their fundamental right to vote. Eligible voters who are unhoused, housing-insecure, or otherwise living at a location with a nonstandard address—or no address at all—retain their right to vote regardless of

the nature or status of their residence. *See, e.g.*, *Cook v. Bd. of Registrars of Randolph Cnty.*, 320 Ga. App. 447, 449–53 (2013); *Collier v. Menzel*, 176 Cal. App. 3d. 24, 35 (Cal. Ct. App. 1985); *Pitts v. Black*, 608 F. Supp. 696, 699 (S.D.N.Y. 1984).

71.     Likewise, as discussed above, residing at a location with a "residential" address is not a qualification to register or vote under Georgia law, *see* O.C.G.A. § 21-2-216, nor is a voter's residency eligibility determined based on the particular zoning type or other designation as to the "residential" or "nonresidential" nature of their address, *see* O.C.G.A. § 21-2-217.

72.     Accordingly, under both federal and state law, that a registered voter resides at a "nonresidential" address is entirely irrelevant to their eligibility to register or to vote under Georgia law.

73.     Section 5 of S.B. 189 is arbitrary and discriminatory in that it treats voters who register to vote at an address deemed "nonresidential" differently from voters who reside at an address deemed "residential," despite the nature of a voter's address having no relevance to their qualification to vote.

74.     Additionally, by failing to provide a clear definition of what constitutes a "nonresidential" address or a clear standard for what information is sufficient to establish a voter's address is "nonresidential," and thereby allowing individual county boards to decide for themselves which sources of information to consider

when determining whether a voter's address is "nonresidential," Section 5 of S.B. 189 essentially ensures that there will be inconsistent adjudication of such "nonresidential" address challenges brought against voters depending on which county they happen to reside in and which county board reviews the challenge.

75.    Likewise, by failing to require that actual notice be provided to a challenged voter as opposed to only notice "if practical," Section 5 of S.B. 189 allows a challenged voter to be disenfranchised for having a "nonresidential" address (however defined) without even being given the opportunity to respond. Nor does S.B. 189 define what constitutes "practical" in this regard.

76.    Further, even if a voter is given an opportunity to respond, S.B.189 fails to provide in the law a conclusive statement that, even if registered at a "nonresidential" address, the voter may rebut a finding of probable cause by showing that they have established residency under Georgia law.  Thus, Section 5 of S.B. 189 subjects these challenged voters to a near certainty of being erroneously disenfranchised without a meaningful opportunity to be heard in defense of their eligibility.

77.    Zoning or other official designations of address type are inconsistent and unreliable indicators of whether a particular address is "residential" or "nonresidential." The Georgia Constitution, under its home rule provision, reserves to cities and counties the substantive power to zone and plan for land within their

respective jurisdictions. Ga. Const. art. IX, sec. II, para. IV. In fact, while the state legislature is authorized to adopt laws governing procedures for zoning, localities have sole authority to exercise the zoning power and adopt individual zoning plans. *Id.* There is, accordingly, wide variance across individual jurisdictions as to which types of uses and facilities may be permitted in particular zoning or land use designations, inevitably leading to arbitrary and disparate treatment dependent solely upon which county a voter happens to reside in.

78.    There are also numerous local ordinances that permit "residential" uses and facilities within "nonresidential" zoning designations, rendering baseless a county board of registrar's reliance on such a designation in determining whether an individual voter's registered address is residential or not. For example, Georgia colleges and universities are frequently located at addresses zoned as commercial or other nonresidential use, making Georgia students residing in campus dormitories subject to challenge under Section 5 of S.B. 189. *See, e.g.*, City of Atlanta Municipal Code, P.t III, Pt. 16, Ch. 11 § 16-11.003(15) (permitted uses for commercial zoning include "[i]nstitutions of higher learning, including colleges and universities"); Athens-Clarke County Code of Ordinances, Tit. 9, Art. I, Ch. 9-5 § 9-10-2 (permitted uses for commercial zoning include "colleges").

79.    As another example, many shelters, nursing homes, and other personal care homes or assisted living facilities may be located at addresses zoned as

31

commercial, making unhoused or housing-insecure and elderly voters particularly vulnerable to challenge under Section 5 of S.B. 189. *See, e.g.*, Atl. Code of Ordinances, Pt. III, Pt. 16, Ch. 11 §§ 16-11.005(1)(e), 16-11.005(1) (m) (permitted uses for commercial zoning include "nursing homes, assisted living facilities, rehabilitation centers and personal care homes" and "[s]helter[s]"); Athens-Clarke County Code of Ordinances, Tit. 9, Art. I, Ch. 9-5 § 9-10-2 (permitted uses for commercial zoning include "[p]ersonal care homes, group" and "congregate").

80.    Special use permits further muddy the waters by granting exceptions to zoning designations for individual facilities or structures.  For instance, addresses located within a particular zoning designation in one county may be uniformly "nonresidential" whereas in the next county over there may allow numerous "residential" uses within an otherwise "nonresidential" zoning designation.  Thus, reliance on zoning designations to determine address type is likely to produce different outcomes for different voters, even if the voters are similarly located at addresses with a "nonresidential" designation.  Moreover, localities in Georgia are allowed to grandfather in non-confirming uses such that public records may not accurately account for this information in resolving a challenge.

81.    As discussed above, Section 5 of S.B. 189 allows a finding of probable cause for a 230 challenge "[i]f a challenged elector's name appears on the National Change of Address data base, as maintained by the United States Postal Service, as

having changed such elector's residence to a different jurisdiction" if it is accompanied by "additional evidence [] indicat[ing] that the elector has lost his or her residency[.]" S.B. 189 § 5(b).

82.    As discussed previously, under Section 8(d) of the NVRA, the only circumstances in which a registered voter may be removed from the rolls based on a change in residence are where (1) the voter requests or confirms his or her change of address in writing; or (2) the voter is sent a postage prepaid and pre-addressed mailing, the voter fails to respond to that mailing, and the voter thereafter then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d)(2)(A)-(B).

83.    Section 5 of S.B. 189 is therefore preempted by Section 8(d) of the NVRA because it purports to expand the circumstances in which a voter may be removed from the voter rolls to include instances in which NCOA data accompanied by unspecified "additional evidence" are used to sustain a voter challenge without following the NVRA's removal procedures.

84.    Section 5 of S.B. 189 also leaves open the question of how a challenged voter might "answer the grounds of the challenge" as required by O.C.G.A. § 21-2-230(c). This creates a situation where different counties may administer different requirements for what a challenged voter must do to rebut a finding of probable cause against them, in violation of the NVRA's requirement that list maintenance procedures be uniform. 52 U.S.C. § 20507(b)(1).

## V.   Section 4 of S.B. 189

85.   Section 4 of S.B. 189 will become effective on January 1, 2025, and provides that "the mailing address for election purposes of any person of this state who is homeless and without a permanent address shall be the registrar's office of the county in which a person resides." S.B. 189 § 4(a)(1.1).

86.   As noted above, nothing in federal or Georgia law requires a voter to have a "residential" address to exercise their fundamental right to vote. *Supra* 28-29. Without explanation or justification, this provision singles out a particular class of Georgia voters for different treatment than all other Georgia voters. The law also fails to account for how each of Georgia's 159 counties will implement this requirement for this targeted class of voters, providing neither a definition of "homeless and without a permanent address" nor a process for determining whether a voter falls under this category, nor resources to support county registrars' implementation of this new and burdensome administration function. This is likely to result not only in a significant administrative burden for county elections officials, but, more importantly, in differential treatment of these voters depending upon the county in which they reside.

87.   Additionally, given the unique and marginalized status of Georgia's unhoused population, this requirement imposes significant burdens on voters who are likely to face substantial barriers in retrieving their election-related mail on a

timely basis from their county registrar's office, including such time sensitive election materials as precinct cards, notice of challenges, or absentee ballot applications. These barriers include physical disabilities, illiteracy, limited English proficiency, and lack of resources for transportation, among others, and make it significantly more likely that these voters will not receive critical and time-sensitive notices and other information necessary to ensure they remain active on the voter registration list, can vote at their correct precinct, and are not disenfranchised.

88.    As of this filing, no county registrar's office has made public a plan for administering a mailroom function or other processes necessary to serve as the mailing address for voters who are "homeless and without a permanent address" as required by Section 4 of S.B. 189.

89.    Nor is it clear whether voters or election officials are responsible for ensuring that the mailing address of a voter who is "homeless and without a permanent address" is actually designated as their county registrar's office. Some county registrars may interpret Section 4 of S.B. 189 as requiring them to unilaterally change whatever mailing address these voters provide on their voter registration application to the address of the registrar's office—an action they have no independent authority to take under Georgia law—while registrars in other counties may decide that voter registration applications submitted by these voters that do not

themselves list the registrar's office as their mailing address must be rejected as invalid.

## CLAIMS FOR RELIEF

## COUNT I

**(42 U.S.C. § 1983 - Violation of the First and Fourteenth Amendments to the United States Constitution as to Section 5 of S.B. 189)**

90.     Plaintiffs re-allege and incorporate every allegation contained in the paragraphs above as if fully set forth herein with respect to Section 5 of S.B. 189.

91.     42 U.S.C. § 1983 authorizes suits for the deprivation of rights secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

92.     The First and Fourteenth Amendments require that state laws imposing burdens on the right to vote must advance relevant and legitimate state interests that are sufficiently weighty to justify the specific burden imposed. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.). When an individual's right to vote is subject to "severe" restrictions, the state election law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434.

93.     Section 5 of S.B. 189 allows for the disenfranchisement of eligible voters  as a result of third-party voter qualification challenges based solely upon the

purported "nonresidential" character of their address—despite that residing at a premises deemed to be "residential" in character is not required by the Georgia Constitution or other any other Georgia law respecting voter eligibility in the State of Georgia.

94.    To avoid disenfranchisement, voters who receive notice of a residence-based challenge—notice which the statute does not require be given—must respond to and rebut the challenge, which could require them to expend considerable time and resources appearing before the county board and marshalling and presenting evidence  to rebut the finding of probable cause, including determining  what evidence would even be sufficient to do so in the first instance.

95.    Georgia law provides for a hearing at which the voter may appear and present evidence to rebut the board's finding of probable cause—an appearance that is a substantial burden in and of itself.  That burden is further compounded by major deficiencies and unknowns in the rebuttal process, which S.B. 189 fails to address. S.B. 189 fails to define "nonresidential"; fails to clearly articulate in the law whether a probable cause finding based on the "nonresidential" nature of a voter's address can be rebutted by a showing that the voter actually satisfies Georgia's residency requirements for voting, regardless of how their residence is categorized; and fails to ensure adequate notice is provided to challenged voters by only requiring notice "if practical."

96.     Section 5 of S.B. 189 thus imposes a severe burden on the right to vote for voters who register to vote at a premises which may be deemed to be "nonresidential" in character, such as shelters, universities, nursing homes, or other facilities which are indisputably residential by virtue of the fact that people actually do reside there yet may be unexpectedly deemed "nonresidential" simply because of some aspect of a jurisdiction's local rules for classifying addresses.

97.     This burden is unjustifiable because registering to vote with a residential address is not a qualification to vote in Georgia elections and bears no relation to such qualification, and so there can be no state interest in creating probable cause for sustaining a challenge to a voter's eligibility on the basis that they reside at a "nonresidential" address, let alone a state interest sufficiently weighty enough to justify disenfranchising eligible voters on that basis.

98.     Mandating that probable cause be found and a voter challenge sustained based on a voter's address being purportedly "nonresidential" creates a process that results in the disparate treatment of unhoused or housing-insecure voters, students living in campus housing, nursing home residents, persons domiciled at a premises deemed commercial in character, and other individuals domiciled at locations characterized as something other than "residential." Such voters face disenfranchisement if they do not incur the time, expense, and other resources to respond to the challenge (if they are even notified of the challenge).

99.    Accordingly, Section 5 of S.B. 189 imposes a severe and unjustified burden on the right to vote for eligible Georgia voters who reside at addresses deemed "nonresidential" in violation of the First and Fourteenth Amendments.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II

### (42 U.S.C. § 1983 – Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution as to Section 5 of S.B. 189)

100.    Plaintiffs re-allege and incorporate every allegation contained in the paragraphs above as if fully set forth herein with respect to Section 5 of S.B. 189.

101.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

102.    The Due Process Clause of the Fourteenth Amendment requires that, before a constitutionally protected right is denied, individuals holding that right be provided with adequate process to safeguard that right—including both reasonable notice and an opportunity to be heard in defense of that right. *See, e.g.*, *Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 313 (1950). *See also Louisiana v. United States*, 380 U.S. 145, 150 (1965) (striking down law providing local election officials discretion to deny right to vote on basis that law failed to provide an "objective standard to guide them"); *Roe v. State of Ala. by and Through Evans*, 43 F.3d 574,

580 (11th Cir.), *certified question answered sub nom. Roe v. Mobile Cnty. Appointment Bd.*, 676 So. 2d 1206 (Ala. 1995) (finding violation of Due Process Clause where "election process itself reaches the point of patent and fundamental unfairness."(citations omitted)).

103.   A court determining what process is due in connection with a potential deprivation of a liberty or property interest must evaluate three factors:

1)   the private interest that will be affected by the official action;

2)   the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

3)   the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mullane*, 339 U.S. at 335. *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). *See also Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1267–68 (11th Cir. 2019) (citing same).

104. Eligible Georgia voters residing at addresses identified as "nonresidential" who are subjected to challenges under Section 5 of S.B. 189 face a high risk of being deprived of their right to vote—the most fundamental of liberty interests.

105.   As discussed above *supra* p. 4, while Georgia provides some process through which a voter challenged on this basis may attempt to avoid disenfranchisement, this process as it relates to Section 5 of S.B. 189 is constitutionally inadequate. There is no requirement that challenged voters be

provided with actual notice, and even if the county board finds probable cause the voter may only be provided with notice and an opportunity to answer "if practical." O.C.G.A. § 21-2-230(b). As a result, under the plain language of the statute, a challenged voter may be disenfranchised for having a "nonresidential" address without even being given the opportunity to be heard in defense of their eligibility.

106.   S.B. 189 also does not include any explanation or confirmation that a finding of probable cause may be rebutted by a showing that the voter meets the residency requirements under the Georgia Constitution, as defined in Georgia law, even if the voter actually resides at a nonresidential address, no matter how it is defined. This means that there may be no sufficient evidence that a challenged voter residing at their address of registration could present to demonstrate that, while their address is identified as "nonresidential," they do, in fact, reside at the address. In other words, despite that living at a "residential" address is not a qualification to vote in Georgia, even if a voter whose eligibility is challenged on this basis is provided with notice, manages to appear, and attests and/or provides evidence that they reside at their address of registration, the challenge to the voter's eligibility may nevertheless be sustained.

107.   Georgia can have no interest whatsoever in creating a basis for the challenge and subsequent disenfranchisement of eligible voters that has no relation to their qualification to vote under Georgia law.

108.    Accordingly, Section 5 of S.B. 189 deprives eligible voters who reside at "nonresidential" addresses adequate notice and a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT III

### (52 U.S.C. §§ 20507, 20510 – Violation of Section 8(b) of the National Voter Registration Act of 1993 as to Section 5 of S.B. 189)

109.    Plaintiffs re-allege and incorporate every allegation contained in the paragraphs above as if fully set forth herein with respect to Section 5 of S.B. 189.

110.    52 U.S.C. § 20510 provides for a private right of action by persons aggrieved as a result of a violation of the NVRA to bring suit to vindicate their rights secured by the NVRA.

111.    Section 8(b)(1) of the NVRA, 52 U.S.C. § 20507(b)(1), provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). *See, e.g.*, *United States v. Florida*, 870 F. Supp. 2d 1346, 1350-51 (N.D. Fla. 2012) (finding Florida program "was likely to have a discriminatory impact on [naturalized] citizens" in violation of Section 8 of the NVRA). *See also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (holding that Ohio law treating compensated canvassers differently than non-compensated

canvassers violated Section 8 of the NVRA because it was "not a uniform and non-discriminatory attempt to protect the integrity of the electoral process").

112.   Section 5 of S.B. 189 violates Section 8(b)(1) of the NVRA because it allows county boards to find probable cause to sustain a challenge to the eligibility of a voter based on the character of the voter's registration address rather than their eligibility to vote in the jurisdiction. As such, the law categorically discriminates against eligible voters who may reside at an address that is deemed "nonresidential." Voters who register to vote at addresses deemed "residential" are not subjected to challenges based upon the character of the premises where they are domiciled. The result is a non-uniform and discriminatory process for identifying people to potentially remove from the voter rolls.

113.   Section 5 of S.B. 189 also violates Section 8(b)(1) of the NVRA because it provides that county boards rely on an undefined and categorically non-uniform collection of sources of information in determining whether an individual registrant's address may be identified as "nonresidential"—a characterization of a voter's address type that is also undefined and categorically non-uniform—which will necessarily result in the non-uniform application of Section 5 of S.B. 189 across counties. From county to county, there will be inconsistent applications of differing standards for determining whether a particular address is "residential" or

"nonresidential," including relying on disparate zoning, land use, occupancy permit, and business license regimes.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **COUNT IV**

### **(52 U.S.C. §§ 20507, 20510 – Violation of Section 8(d) of the National Voter Registration Act of 1993 as to Section 5 of S.B. 189)**

114.   Plaintiffs re-allege and incorporate every allegation contained in the paragraphs above as if fully set forth herein with respect to Section 5 of S.B. 189.

115.  52 U.S.C. § 20510 provides for a private right of action by persons aggrieved as a result of a violation of the NVRA to bring suit to vindicate their rights as provided by the NVRA.

116.  Section 8(d) of the National Voter Registration Act of 1993, 52 U.S.C. § 20507(d)**,** expressly prohibits a state from removing a voter's name from the voter rolls due to a change in residence unless and until either: (1) the voter requests or confirms his or her change of address in writing; or (2) the voter is sent a postage prepaid and pre-addressed mailing, the voter fails to respond to that mailing, and the voter then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d)(1), (2).

117.  Section 8(d) of the NVRA sets forth the exclusive method for removing active and inactive electors in federal elections from the official voter registration list due to an alleged change in residence. 52 U.S.C. § 20507(d).

118.    Section 5 of S.B. 189 provides for a finding of probable cause to sustain a voter challenge based upon a third party's allegations that a registered voter has moved out of the jurisdiction—allegations which, under the statute, can be premised in NCOA data accompanied by ambiguous and undefined "additional evidence." As a result, challenged voters face disenfranchisement in an election and potential removal from the voter registration list in violation of the notice, address confirmation procedure, and waiting period mandated by 52 U.S.C. § 20507(d).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT V

**(42 U.S.C. § 1983 – Violation of the First and Fourteenth Amendments to the United States Constitution as to Section 4 of S.B. 189)**

119.    Plaintiffs re-allege and incorporate every allegation contained in the paragraphs above as if fully set forth herein with respect to Section 4 of S.B. 189.

120.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

121.    The First and Fourteenth Amendments require that state laws imposing burdens on the right to vote must advance relevant and legitimate state interests that are sufficiently weighty to justify the specific burden imposed. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J.,

controlling op.). When an individual's right to vote is subject to "severe" restrictions, the state election law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434.

122.   Section 4 of S.B. 189 subjects eligible voters "who [are] homeless and without a permanent address," and not other voters, to bear the significant burden of expending the resources required to routinely and repeatedly check in at the county registrar's office to determine if they have any election mail (assuming that office is even accepting that mail for them in the first place), or otherwise risk disenfranchisement due to their failure to receive information essential to their ability to successfully cast a ballot that will be counted, including which precinct they may vote in; whether their qualification to vote has been challenged; whether their request for an absentee ballot has been denied; and an absentee ballot itself. S.B 189 Section 4(a)(1)(1.1).

123.   The burdens imposed by Section 4 of S.B. 189 are particularly significant for the very voters affected by the challenged provision—"homeless" voters—who disproportionately are likely to lack the resources needed to shoulder these burdens, including having the ability to travel to their county registrar's office if they do not have access to a vehicle; have little or no access to public transit; are unable to walk to, or access the county registrar's office during

business hours; are illiterate or physically disabled and need assistance in voting; or face other challenges retrieving their election related mail at the registrar's office.

124.   These burdens are further compounded by the law's failure to account for the fact that counties are not experienced in and may not be able to operate a mail room in a way that provides these voters effective access to their election mail.

125.   These burdens are unjustified because any minimal interest the State may assert in forcing "homeless" voters, but not other voters, to receive their election mail at the county registrar's office rather than the address of their choice is undermined and exceeded by the State's own strong election administration and security interests in ensuring all voters receive essential election mail, and is further undermined by the significant administrative burdens imposed on county registrars by the challenged provision.

126.   Accordingly, Section 4 of S.B. 189 imposes a significant and unjustified burden on the right to vote for eligible Georgia voters who are determined to be "homeless and without a permanent address" in violation of the First and Fourteenth Amendments.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT VI

**(52 U.S.C. §§ 20507, 20510 – Violation of Section 8(b) of the National Voter Registration Act of 1993 as to Section 4 of S.B. 189)**

127.   Plaintiffs re-allege and incorporate every allegation contained in the paragraphs above as if fully set forth herein with respect to Section 4 of S.B. 189.

128.   52 U.S.C. § 20510 provides for a private right of action by persons aggrieved because of a violation of the NVRA to bring suit to vindicate their rights as provided by the NVRA.

129.   Section 8(b)(1) of the NVRA, 52 U.S.C. § 20507(b)(1), provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). *See, e.g.*, *United States v. Florida*, 870 F. Supp. 2d 1346, 1350–51 (N.D. Fla. 2012) (finding Florida program "was likely to have a discriminatory impact on [naturalized] citizens" in violation of Section 8 of the NVRA). *See also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (holding that Ohio law treating compensated canvassers differently than non-compensated canvassers violated Section 8 of the NVRA because it was "not a uniform and non-discriminatory attempt to protect the integrity of the electoral process").

130.   Section 4 of S.B. 189 violates Section 8(b)(1) of the NVRA because it requires Georgia voters who are "homeless and without a permanent address" to receive their official election mail at the registrar's office of the county in which the voter resides, rather than the address of their choice, while imposing no such

requirement on all other voters, thus imposing an explicitly discriminatory list maintenance requirement targeting unhoused and housing-insecure voters.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)    Enter judgment in favor of Plaintiffs and against the Defendant on the claims for relief as alleged in this Complaint;

(2)    Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged provisions of S.B. 189 violate the First and Fourteenth Amendments to the United States Constitution;

(3)    Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged provisions of S.B. 189 violate the National Voter Registration Act of 1993;

(4)    Enjoin the Defendant, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing any of the challenged provisions of S.B. 189;

(5)    Enjoin the Defendant, their agents, officers, employees, successors, and all persons acting in concert with them from giving effect to the removal of any registered voter from the statewide voter registration system pursuant to a challenge

to the voter's qualification on the basis that their residence address has been determined to be "nonresidential;"

(6)   Grant Plaintiffs preliminary and/or permanent injunctive relief by:

      a.   Ordering that the Defendant issue guidance to all county boards providing that they, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from enforcing the challenged provision of Section 5 of S.B. 189 with respect to any voter qualification challenges made to any voter;

      b.   Ordering that the Defendant issue guidance to all county boards providing that they, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from rejecting or causing to be rejected any ballot cast by any voter pursuant to a determination that the voter's address is "nonresidential;" and

      c.   Ordering that the Defendant issue guidance to all county boards providing that they, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from rejecting, causing to be rejected, cancelling, and/or causing to be cancelled any voter registration or voter registration application

pursuant to a determination that the registrant's address is "nonresidential."

(7)     Ordering that the Defendant provide training to all county boards as to all of the preceding forms of relief;

(8)     Retain jurisdiction over the Defendant for such period of time as may be appropriate to ensure Defendant's compliance with the relief ordered by this Court;

(9)     Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310(e), and 52 U.S.C. § 20510(c); and

(10)   Order any other relief that this Court deems just and proper.


Respectfully submitted this 24th day of September, 2024,


Cory Isaacson (Ga. Bar No. 983797)
Caitlin May (Ga. Bar No. 602081)
Akiva Freidlin (Ga. Bar No. 692290)
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357
(678) 310-3699
cisaacson@acluga.org
cmay@acluga.org
afreidlin@acluga.org


Ezra Rosenberg*
Julie M. Houk*

Marlin David Rollins-Boyd*
Ryan Snow*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
General Fax: (202) 783-0857
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
rsnow@lawyerscommittee.org


Neil A. Steiner*
Mara Cusker Gonzalez*
Biaunca S. Morris*
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Neil.steiner@dechert.com
Mara.cuskergonzalez@dechert.com
Biaunca.morris@dechert.com


Lindsey B. Cohan*
Dechert LLP
515 Congress Ave. STE 1400
Austin, TX  78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
Lindsey.cohan@dechert.com


*Attorneys for Plaintiffs*

*Pro Hac Vice* forthcoming